

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| AMBER HALE, f/k/a AMBER KOESTER, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. SD36912 |
| | ) | |
| BURLINGTON NORTHERN & | ) | FILED: December 3, 2021 |
| SANTA FE RAILWAY COMPANY, | ) | |
| | ) | |
| Respondent. | ) | |

APPEAL FROM THE CIRCUIT COURT OF WEBSTER COUNTY

Honorable William E. Hickle, Judge

**<u>AFFIRMED</u>**

This appeal, the third in this case, *see* ***Hale v. Burlington N. & Santa Fe Rwy. Co.***, 524 S.W.3d 603 (Mo.App. 2017); ***Hale v. Wait***, 364 S.W.3d 720 (Mo.App. 2012), arises from a collision ("the collision") between a motor vehicle driven by Amber Hale and a train operated by BNSF Railway Company ("BNSF"). Hale filed suit against BNSF that resulted in a jury verdict followed by a trial court judgment on all counts in favor of BNSF. Hale presents ten points on appeal, each of which fails either to present a cognizable basis upon which to reverse the trial

court's judgment or to demonstrate reversible error. Because the trial court's judgment is presumed correct and Hale fails her burden to demonstrate otherwise, we affirm.[1]

## Factual and Procedural Background

The collision between Hale's vehicle and the train occurred at Crossing #667633J ("the South Iron Mountain Road Crossing") in Webster County, Missouri, on March 23, 2008, between 8:30 p.m. and 9:00 p.m. The train's engineer was Steve Wait and its conductor was Lance Frost. Both were BNSF employees. The train was traveling 47 miles per hour ("mph") at the moment of the collision.

After the collision, Hale filed suit against BNSF. Her fifth amended petition sought compensatory and punitive damages against BNSF under negligence and negligence per se causes of action. Hale's specific allegations of negligence were as follows:

> a. Wait and/or Frost failed to keep a careful lookout and see Plaintiff Hale in sufficient time to prevent the collision and Defendant BNSF failed to require their keeping of such careful lookout;
>
> b. Wait and/or Frost failed to adhere to the speed restrictions applicable to that track and crossing on March 23, 2008 and Defendant BNSF failed to require their adherence to the applicable speed restrictions;
>
> c. Wait, Frost and/or Defendant BNSF failed to provide and/or sound a timely, proper and/or adequate warning; further, the condition of the crossing and crossing area as alleged above was unusually dangerous, hazardous, extra-hazardous, unsafe or defective and Wait, Frost and/or Defendant BNSF failed to provide and/or sound a timely, proper and adequate warning;
>
> d. Defendant BNSF failed to provide and/or properly maintain all required warning devices, including the lights and/or bells and an automatic gate, at the South Iron Mountain Crossing, in violation of law including but not limited to 23 CFR 646.214(b) and Revised Statutes of Missouri §389.610.2 and §389.614;

---

[1] BNSF filed a motion to dismiss Hale's appeal, alleging various Rule 84.04 briefing violations. As discussed in greater detail, *infra*, Hale's brief violates Rule 84.04 in many respects. However, to the extent we possibly can discern Hale's arguments, we do so *ex gratia*. BNSF's motion to dismiss is denied. All rule references are to Missouri Court Rules (2021).

e. Defendant BNSF failed to abide by federal law requiring that the active grade crossing warning systems operate on the fail-safe principle.

A jury trial on Hale's petition commenced on February 4, 2020, that ended in a mistrial ("the February 4 trial"). A second jury trial on Hale's petition commenced on August 24 and continued through to verdict on September 4, 2020, ("the August 24 trial"). The jury in that trial heard evidence and was instructed, in pertinent part, about two scenarios that, if believed, required a percentage of fault for the collision to be assessed to BNSF. BNSF fault under verdict-directing Instruction No. 9 required (1) that the track on approach to the South Iron Mountain Road Crossing was a Class 3 track, and (2) that BNSF's crew operated the train in excess of 40-mph, and (3) that as a direct result of such conduct Hale sustained damage. BNSF fault under verdict-directing Instruction No. 10 required (1) that either the train crew failed to keep a careful lookout, failed to sound the horn, or failed to warn by timely activation of lights and bells; (2) that BNSF in any one or more of these respects was negligent; and (3) that as a result of such negligence, Hale sustained damage.

After its deliberations, the jury returned its verdict assessing no fault to BNSF. The trial court then entered judgment in accordance with the jury's verdict and denied Hale's motion for a new trial.

Hale timely appeals, raising ten points containing numerous Rule 84.04 briefing deficiencies significantly impacting our ability to discern Hale's claims and whether they were properly preserved in the trial court for appellate review. Our evaluations of those deficiencies and their impact upon appellate review throughout this opinion are made within the context of a sprawling record consisting of more than 4,200 pages of transcript, more than 9,100 pages of documents in the legal file, and more than 2,400 pages of exhibits, thereby comprising a record

on appeal in excess of 15,700 pages plus several non-paginated audio, video and computer data exhibits that cannot be included in that page count.

## Discussion

### *Applicable Principles of Preservation and Briefing of Claims*

"The appellate court is a court of review." ***Henson v. Henson***, 195 S.W.3d 479, 484 (Mo.App. 2006). As a general matter, this Court's review is guided by four policy interests: "(1) we presume the challenged judgment is correct; (2) we presume the trial court knows and applies the law; (3) we will affirm the outcome on any basis supported by the record; and (4) it is appellant's burden to dislodge us from the presumption that the outcome below was correct." ***Bramer v. Abston***, 553 S.W.3d 872, 879 (Mo.App. 2018). "To satisfy this burden, and overcome the judicial preference for 'finality of judgments,' an appellant must comply with the rules of appellate procedure." ***Id.***

Compliance with the rules of appellate procedure is mandatory and necessary "to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made." ***Myrick v. Eastern Broadcasting, Inc.***, 970 S.W.2d 885, 886 (Mo.App. 1998). "It is not our function as an appellate court to serve as advocate for any party on appeal." ***Henson***, 195 S.W.3d at 484. "[S]uch an undertaking is inappropriate not only because it requires considerable time and judicial resources, but because it forces this Court to don the cap of advocacy while forsaking our traditional appellate role." ***Id.***

Here, the following procedural requirements command our primary focus:

> Apart from questions of jurisdiction of the trial court over the subject matter, *allegations of error not briefed or not properly briefed shall not be considered in any civil appeal* and *allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case.*

Rule 84.13(a) (emphasis added).

4

The importance of these two requirements—the proper preservation of allegations of error in the trial court, followed by the proper briefing of those alleged errors on appeal—are discussed separately and in greater detail below.[2]

*Relevant Trial Court Preservation Requirements*

> Generally, the requirement that an issue be preserved is based on ideas of efficiency and fair play. A party should make any objection to the trial process at the earliest opportunity to allow the other party to correct the problem without undue expense or prejudice. Having been informed of the objection, the opposing party can choose to eliminate the complaint or may stand his or her ground and risk reversal on appeal. Likewise, if a party fails to make an objection when the concern can be corrected at the earliest and easiest opportunity, he or she will not be heard to complain later when the cost of correction may be far more onerous.

***Sanders v. Ahmed***, 364 S.W.3d 195, 207 (Mo. banc 2012).

These general preservation principles give rise to *timing* and *specificity* requirements for trial objections. *See, e.g.*, ***Hancock v. Shook***, 100 S.W.3d 786, 802 (Mo. banc 2003) (holding that a pretrial motion in limine is interlocutory, subject to change during the course of a trial, and, by itself, preserves nothing for appeal); ***Chamberlain v. Director of Revenue***, 342 S.W.3d 334, 339 (Mo.App. 2011) (holding that to preserve a challenge to the exclusion of evidence, a definite and specific offer of proof showing the admissibility of the evidence must be made at trial); ***Matter of Estate of Dean***, 967 S.W.2d 219, 222 (Mo.App. 1998) (holding that to preserve a challenge to the admission of evidence, an objection must be made when the evidence is offered); ***State v. Harden***, 750 S.W.2d 666, 668 n.1 (Mo.App. 1988) (holding that a mistrial is a nullity and that any motions filed during those proceedings have no bearing on the subsequent proceedings); Rule 70.03 (stating that "[n]o party may assign as error the giving or failure to give

---

[2] The specific trial court preservation and appellate briefing requirements discussed herein are those that are relevant to our discussion of Hale's points and are not necessarily exhaustive of all such requirements.

instructions unless that party objects thereto on the record during the instructions conference, stating distinctly the matter objected to and the grounds for the objection").

"An appellant's failure to preserve an issue at the trial court waives the issue, and it is not reviewable on appeal." *Kerr v. Missouri Veterans Commission*, 537 S.W.3d 865, 880 (Mo.App. 2017) (internal quotation marks omitted). "Appellate courts are merely courts of review for trial errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court." *Barkley v. McKeever Enters., Inc.*, 456 S.W.3d 829, 839 (Mo. banc 2015). In the same vein, "[i]n order to properly raise an issue on appeal, the allegations of error must be based upon the theory voiced in the objection at trial and a defendant cannot expand or change on appeal the objection as made." *Meadowfresh Solutions USA, LLC v. Maple Grove Farms, LLC*, 586 S.W.3d 329, 344 (Mo.App. 2019) (internal quotation marks omitted).

*Relevant Briefing Requirements*

On appeal, a claim of trial court error must be asserted in a point relied on in the appellant's brief. Rule 84.04(a) and (d). All such points relied on *shall*, "(A) [i]dentify the trial court ruling or action that the appellant challenges; (B) [s]tate concisely the legal reasons for the appellant's claim of reversible error; and (C) [e]xplain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1)(A)-(C).

While nothing requires that the identification of a trial court ruling or action in a point relied on include any citation to the record on appeal, it must, nevertheless, sufficiently put the court and respondent on notice as to which specific ruling or action appellant is challenging. *See Burgan v. Newman*, 618 S.W.3d 712, 715 (Mo.App. 2021) ("The purpose of Rule 84.04(d) is to give notice to Respondents of the precise matters that must be contended with and to inform us of the issues presented for review."); *see also Morfin v. Werdehausen*, 448 S.W.3d 343, 349 (Mo.App. 2014) (holding that a point relied on is "defectively vague" under Rule 84.04 if it fails

6

to identify the ruling or action challenged); ***Boshears v. Saint-Gobain Calmar, Inc.***, 272 S.W.3d 215, 225 (Mo.App. 2008) (holding that a point relied on that requires a court "to speculate and determine what ruling of the circuit court [the appellant] asserts was error" fails to comply with Rule 84.04).

Putting the court and respondent on such notice requires that an appellant challenge only *one* trial court ruling or action in a single point relied on. *See* ***Buchheit, Inc. v. Tiller-Cohen Farm, L.P.***, 391 S.W.3d 888, 889 n.1 (Mo.App. 2013) ("A point that challenges multiple trial court rulings is multifarious, does not comply with Rule 84.04, and preserves nothing for review."). "Separate issues should be stated in separate points relied on." ***Wheeler v. McDonnell Douglas Corp.***, 999 S.W.2d 279, 283 n.2 (Mo.App. 1999). This is so because "separate and distinct inquiries … require discrete legal analyses." ***Lollar v. Lollar***, 609 S.W.3d 41, 45 n.4 (Mo. banc 2020). This Court, in its discretion, may review all, some, or none of a multifarious point relied on. *See, e.g.*, ***Fowler v. Missouri Sheriffs' Retirement System***, 623 S.W.3d 578, 582-83 (Mo. banc 2021) (electing to review *none* of the claims in a multifarious point relied on); ***Griffitts v. Old Republic Insurance Company***, 550 S.W.3d 474, 478 (Mo. banc 2018) (electing to review *only the first* of two claims in a multifarious point relied on).

A deficient point relied on that fails to comply with Rule 84.04(d) is a sufficient basis upon which to dismiss or deny the point. ***Boyd v. Boyd***, 134 S.W.3d 820, 823 (Mo.App. 2004). Nevertheless, and although not required, an appellate court may, in its discretion, look to other portions of an appellant's brief in attempting to ascertain the issue being raised in a deficient point relied on. *Id.* at 824.

The argument section of an appellant's brief serves as the vehicle by which an appellant demonstrates why the trial court ruling or action, as specifically identified in the point relied on,

7

is erroneous because of the legal reasons, as concisely stated in the point relied on, in that the case context, as summarily asserted in the point relied on, supports the stated legal reasons for the claim of reversible error. Rule 84.04(d)(1)(A)-(C). This means that "[t]he argument *shall* be limited to those errors included in the 'Points Relied On.'" Rule 84.04(e) (emphasis added). "Claims of error raised in the argument portion of a brief that are not raised in a point relied on are not preserved for our review." **Davis v. Wieland**, 557 S.W.3d 340, 352 n.10 (Mo. App. 2018) (internal quotation marks omitted).

The argument must also factually demonstrate, among other things, that appellant's claim was properly presented and preserved in the trial court in a manner that permits appellate review. For the claim of error set out in a point relied on, the argument *shall* include, "a concise statement describing whether the error was preserved for appellate review" and "if so, how it was preserved… " (the "preservation statement"). Rule 84.04(e). And, unlike points relied on, all factual assertions purporting to demonstrate such preservation, like all other factual assertions in the argument, "shall have specific page references to the relevant portion of the record on appeal, i.e., legal file, transcript, or exhibits." **Id.**

This means that Rule 84.04(e) requires more than a conclusory preservation statement. A preservation statement, while concise, must nevertheless precisely identify with specific page references to the relevant portion of the record on appeal both (1) the challenged trial court ruling or action challenged in the point relied on and (2) how the legal reasons and the context of the case supporting those legal reasons as the claim for reversible error asserted in the point relied on were timely and specifically presented to the trial court in relation to the trial court making or taking the challenged ruling or action.

"The failure to comply with Rule 84.04(e) in this respect can contribute to impeding meaningful appellate review of the trial court's judgment and thereby failing to preserve any issue for appellate review." *Marck Industries, Inc. v. Lowe*, 587 S.W.3d 737, 745 (Mo.App. 2019). "A party's mandated compliance with Rule 84.04(e) provides this Court with the tools with which to verify the accuracy of the factual assertions in the argument upon which a party relies to support its argument." *Robert T. McLean Irrevocable Trust u/a/d March 31, 1999 ex rel. McLean v. Ponder*, 418 S.W.3d 482, 496 (Mo.App. 2013) (internal quotation marks omitted); *see also* *Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978) ("After stating why the ruling was erroneous, the court then must be informed [w]herein the testimony or evidence gives rise to the ruling for which appellant contends."). "It is not our duty to supplement the deficient brief with our own research, thus noncompliance with Rule 84.04(e) justifies dismissal." *Burgan*, 618 S.W.3d at 716.

In addition, because the argument is so closely intertwined with the specific elements of its associated point relied on, "the use of incorporation by reference is not sufficient in the argument section of a Point Relied On." *Frazier v. City of Kansas City, Missouri*, 467 S.W.3d 327, 346 (Mo.App. 2015); *see also* *Sugar Ridge Properties v. Merrell*, 489 S.W.3d 860, 873 n.8 (Mo.App. 2016) ("Individual points relied on necessarily present separate arguments and deserve separate analysis. A party is obligated to support all points with appropriate argument and legal authority, *Lattimer v. Clark*, 412 S.W.3d 420, 423 (Mo.App.2013), and that obligation is not satisfied by references to other portions of the brief.").

"While perfection is not required, compliance with appellate briefing rules is mandatory to ensure that appellate courts do not become advocates by speculating on facts and arguments that have not been asserted." *Burgan*, 618 S.W.3d at 714 (internal quotation marks omitted). In

9

our discretion, however, we may review cases on the merits "where disposition is not hampered by rule violations and the argument is readily understandable." ***Bennett v. Taylor***, 615 S.W.3d 96, 98 (Mo.App. 2020). Our preference to resolve matters on the merits, however, is not a license for non-compliance with Rule 84.04. ***Marck Industries, Inc.***, 587 S.W.3d at 743. "We wield our discretion to overlook briefing violations with caution because each time we review a noncompliant brief *ex gratia*, we send an implicit message that substandard briefing is acceptable. It is not." ***Id.***

<u>*Summary of Relevant Preservation and Briefing Principles*</u>

The foregoing preservation and briefing principles demonstrate the interconnected nature of a point relied on, the argument of that point, and the required preservation statement in that argument. Simply put, as a necessary step to preserve and present a claim of error for appellate review, an appellant must identify in the argument *specific factual assertions*, supported by citation to specific page references to the relevant portion of the record on appeal, as to (1) the existence of a *singular challenged ruling or action* of the trial court identified in the point relied on and (2) the *timely presentation* to the trial court of *the legal reasons and the case context for the claimed reversable error* identified in the point relied on as related to the challenged ruling or action.

With this framework in mind, our discussion turns to Hale's ten points relied on and supporting arguments. We first outline the legal principles that govern our review of those points. We then evaluate and discuss Hale's points separately and in order. If a point violates the aforementioned briefing framework and those violations impede meaningful appellate

10

review, we must deny the point without reaching its merits.[3]  If a deficient point *does not* foreclose or impede meaningful appellate review, we exercise our discretion to review its merits *ex gratia*.

### *Applicable Principles of Appellate Review*

An appellant has "'the burden to overcome many presumptions on appeal, including the presumption that the circuit court's judgment is correct.'"  ***City of De Soto v. Parson***, 625 S.W.3d 412, 416 (Mo. banc 2021) (quoting ***Lollar*** , 609 S.W.3d at 45 n.4); *see also* ***Ford Motor Credit Co. LLC v. Harris***, 386 S.W.3d 864, 866 (Mo. App. 2012) (citing ***Delaney v. Gibson***, 639 S.W.2d 601, 604 (Mo. banc 1982) for proposition that trial court's judgment is presumed correct and it is appellant's burden to demonstrate otherwise).

Seeking to demonstrate that the trial court's judgment is incorrect, Hale's points include, in pertinent part, purported challenges to the admission and exclusion of evidence (points two, three, five, six and seven), to the submission of jury instructions (point four), and to rulings on discovery (points eight and nine).

 "A trial court 'enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal.'"  ***Lozano v. BNSF Ry. Co.***, 421 S.W.3d 448, 451 (Mo. banc 2014) (quoting ***Moore v. Ford Motor Co.***, 332 S.W.3d 749, 756 (Mo. banc 2011)).  However, "[e]ven if the trial court has abused its discretion in excluding evidence, this Court is loathe to vacate a jury's verdict and resulting judgment on such grounds."  ***Id.***  "Instead, 'by both statute and rule, an appellate court is not to reverse a judgment unless it believes the error committed by the trial court against the appellant materially

---

[3] Although Rule 84.13(c), provides an avenue for appellate review of unpreserved errors, Hale makes no allegation of or argument in support of plain error review.  *See* ***State v. Davis***, 348 S.W.3d 768, 770 n.4 (Mo.banc 2011) (declining to engage in plain error review where there was no claim of plain error).

affected the merits of the action.'" ***Id.*** at 451-52 (quoting ***Lewis v. Wahl***, 842 S.W.2d 82, 84-85 (Mo. banc 1992)). "An abuse of discretion compels reversal only if the prejudice resulting from the improper admission of evidence is outcome-determinative." ***Bowolak v. Mercy East Communities***, 452 S.W.3d 688, 703 (Mo.App. 2014) (internal quotation marks omitted). "Prejudicial error does not exist when the complained-of evidence was cumulative to other properly admitted evidence." ***J.C.M. v. J.K.M.***, 573 S.W.3d 672, 689 (Mo. App. 2019).

In contrast, "[w]e review a trial court's decision not to give a proffered instruction under a *de novo* standard of review, determining whether it was supported by the evidence and the law." ***Rader Family Ltd. P'ship, L.L.L.P. v. City of Columbia***, 307 S.W.3d 243, 252 (Mo.App. 2010). The same *de novo* standard of review is applied to statutes and regulations. ***Turner v. Missouri Department of Conservation***, 349 S.W.3d 434, 442 (Mo.App. 2011).

Finally, "[w]e review a trial court's denial of a motion to compel discovery for an abuse of discretion." ***City of Byrnes Mill v. Limesand***, 599 S.W.3d 466, 475 (Mo.App. 2020). "We allow the trial court broad discretion in the control and management of discovery, but we will find it abused its discretion if its ruling was clearly against the logic of the circumstances then before it and so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of careful consideration." ***City of Wentzville v. Dodson***, 133 S.W.3d 543, 548 (Mo.App. 2004).

### *Point One*

For her first point, Hale contends:

The trial court erred in denying Hale judgment as a matter of law on her claim of Negligence Per Se (Speed) because there was no genuine issue as to any material fact in that BNSF admitted – expressly or by operation of law – that at the time of the collision the track upon which the train traveled was governed by a 40-mph speed limit/restriction but BNSF operated the train at 47 miles per hour.

12

BNSF correctly notes that Hale's argument under this point includes at least five distinct, non-summary-judgment claims of error that are not addressed in or by the point relied on. While Hale's summary judgment claim is arguably preserved, the additional claims are not as they are outside the scope of the point relied on. *See* Rule 84.04(e); ***Davis***, 557 S.W.3d at 352 n.10. Our appellate review, therefore, is limited to the denial of summary judgment claim asserted *in* Hale's point relied on.

*Summary Judgment Denial Not Appealable*

As to Hale's summary judgment claim, BNSF argues that the denial of a motion for summary judgment is not an appealable order. In response, Hale argues that the denial of summary judgment is an appealable order when, as in this context, the appeal is taken from a final judgment. Hale is incorrect.

Hale's argument relies on ***First Nat'l Bank, N.A. v. Jefferson Ins. Co. of New York***, 891 S.W.2d 140 (Mo.App. 1995). In that case, as Hale notes, this Court stated that "[w]e need not decide whether the purpose of the rule proclaiming that the denial of a summary judgment is an interlocutory order which is neither final nor appealable is served under a factual scenario such as the instant case where no issues of any kind remain for decision by the trial court." ***Id.*** at 141. Hale construes this statement as authorizing an appeal from the denial of a motion for summary judgment so long as the appeal comes following a final judgment. What Hale overlooks, however, is that this Court proceeded to ultimately construe the point relied on at issue in ***First Nat'l Bank, N.A.*** as a challenge to the trial court's *grant* of summary judgment in favor of the respondent. ***Id.*** at 142.

Here, the final judgment arose not from the grant of summary judgment but, instead, from jury verdicts that were reached following a trial. Hale's first point, therefore, cannot be

construed as anything other than a challenge to the trial court's *denial* of her motion for summary judgment. As recognized by all of this state's appellate courts, however, the "denial of a motion for summary judgment is not subject to appellate review, *even when an appeal is taken from a final judgment* and not from the denial of a motion for summary judgment." ***Schnurbusch v. West Plains Regional Animal Shelter***, 571 S.W.3d 191, 203 (Mo.App. S.D. 2019) (emphasis added) (internal quotation marks omitted); ***Gilmore v. Erb***, 900 S.W.2d 669, 671 (Mo.App. E.D. 1995); ***State ex rel. Missouri Div. of Transp. v. Sure-Way Transp., Inc.***, 884 S.W.2d 349, 351 (Mo.App. W.D. 1994); *see also* ***Dhyne v. State Farm Fire & Cas. Co.***, 188 S.W.3d 454, 456 n.1 (Mo. banc 2006) (holding that in an appeal from a final judgment, the denial of a summary judgment motion was not appealable and could only be reviewed if its merits were completely intertwined with a grant of summary judgment in favor of an opposing party). Accordingly, Hale's first point does not present a cognizable appellate claim and is, therefore, denied.

### *Point Two*

For her second point, Hale contends:

> The trial court erred in excluding evidence because of federal preemption and privilege statutes in that said evidence that the 1990s and 2007 crossing signal warning systems were not properly and timely installed and maintained and thus failed to properly and timely provide warning to Hale of the oncoming BNSF train on March 23, 2008 is neither preempted nor privileged.

#### *Briefing Deficiencies*

In purporting to identify the trial court ruling or action at issue in her point, Hale asserts only that "[t]he trial court erred in excluding evidence[.]" Such a vague assertion fails to put BNSF or this Court on notice as to *what* evidence is at issue in this point or *which* particular trial court ruling or action excluded it. *See* Rule 84.04(d)(1)(A).

Hale's accompanying argument offers little additional help. The argument has no preservation statement, *see* Rule 84.04(e), which arguably could have provided some specificity.

14

At best, the argument reveals Hale's point to be multifarious, *see **Buchheit, Inc.***, 391 S.W.3d at 889 n.1, because we discern at least *seven* different claims scattered throughout alleging the erroneous exclusion of evidence. Those claims are listed and quoted as follows:

1. The Court further erroneously excluded a video taken by Hale's crossing signal warning system expert, W.L. Farnham, Jr., which would have demonstrated for the jury an intermittent "Activation Failure" at a different crossing that was caused by the same component that failed in the crossing signal warning system at issue. (Plaintiff's Offer of Proof Trial Exhibit 224A).

2. §389.610.7 locked-in as 'final and binding' the 'apportionment' of costs detailed in the 1990s and 2007 'agreements' between Missouri and BNSF. (Exhibits 120A and 120B). Thus, MoDOT was prevented by law from later reimbursing BNSF with any federal funds for any costs that the "agreements" show apportioned "100%" to the State of Missouri. Consequently, the trial court erred as a matter of law when it grounded its exclusionary ruling on its finding that the 1990s and 2007 crossing signal warning systems were paid with 90% federal funds because "[w]here reimbursement to a railroad for changes in warning devices is referred to as 100% MoDOT, that fund consists of state funds and Section 130 federal highway funds." (LF 374, Paragraphs 5, 6, 14 and 15).

3. [T]he trial court further erred in excluding MoDOT's Eric Curtit's testimony, grounded on a state plan, budget document and engineering drawing, that in July 2007 the State approved a new crossing signal warning system for the South Iron Mountain Road Crossing #667633J at Milepost 225.41 and that "the State of Missouri is funding this project 100 percent," but that BNSF did not install this system until after the March 23, 2008 collision.

4. In its order dated February 18, 2020 (LF 374, Paragraphs 17-24) and in its trial rulings (Feb. 4-5, 2020 Jury Trial p. 19-26, 369-387; Aug. 20, 2020 Hearing p. 31-61; T p. 301-316), the trial court excluded Trial Exhibits 119, 120A, 120B, 120C (also known as deposition exhibits 717, 719, 720 and 721) and related testimony by MoDOT's Eric Curtit, despite the fact that all of this evidence was dated months or years prior to the October 16, 2008 effective date of 23 U.S.C. §409.

5. [T]he trial court erroneously excluded the *testimony* of MoDOT's Curtit, and of BNSF's Division Engineer Mendoza that at least by July 2007 Missouri had authorized BNSF to upgrade the active warning devices at the South Iron Mountain Road Crossing.

6. The trial court erred by excluding a *five-year state budgetary document and an engineering drawing*. Regarding Plaintiff's Trial Exhibit 119/Deposition Exhibit 721, the July 2007 MoDOT "Multimodal Operations" document, also referred to as the Statewide Transportation Improvement Program document or "STIP," Curtit's deposition testimony that the trial court excluded was that the highway-railroad grade crossing warning system at Crossing #667633J was approved to be replaced 9 months prior to the March 23, 2008 collision with a new design that included gates/arms, and that $200,000 of Missouri taxpayer money had been so allocated. And, the engineering drawing for the new design which included gates/arms was completed and dated February 29, 2008 – a full month prior to the collision at issue.

7. The trial court further erred by excluding BNSF's *Rule 59.01 admissions* Nos. 105 and 107 in which BNSF admits to prior train-motor vehicle collisions at Crossing #667633J and to the installation of train-activated crossing gates or arms after the March 23, 2008 collision at issue herein. [Followed by a footnote containing a citation to "Plaintiff's Offer of Proof Trial Exhibit 386AA."]

There are multiple problems with each of these multifarious claims that impede appellate review, even if we consider them individually. The third, fifth, and sixth are unaccompanied by *any* citations to the record, *see* Rule 84.04(e), thereby inhibiting our ability to determine whether and how those alleged exclusions of evidence were preserved for appellate review. The first, second, fourth, and seventh contain citations to the legal file, transcripts, or exhibits; however, none of those citations contain any indication *where in the record* an attempt was made to offer the exhibits and testimony in question into evidence. *See Hancock*, 100 S.W.3d at 802. Rather, all of the citations to the legal file and transcript are to argument and rulings concerning certain *motions in limine*, which are insufficient for the purpose of demonstrating preservation. *See id.*

As to the cited exhibits, the trial transcript does not reflect that Exhibits 119, 120B, or 120C were offered into evidence as is required to preserve their exclusion for appellate review. *See id.* Exhibit 120A, in its entirety, was offered into evidence[4]; however, a review of that

---

[4] By agreement of the parties, selected pages of Exhibit 120A were previously offered and admitted into evidence as Exhibit 120D.

portion of the transcript reveals that counsel for BNSF referenced a previous objection to Exhibit 120A and the trial court ultimately deferred its ruling "until we've had a chance to take a look at it." Hale has not identified, nor can we find, where in the transcript, if at all, the trial court issued any ruling excluding Exhibit 120A from evidence.

The remaining exhibits cited by Hale are Exhibits 224A and 386AA (containing requests for admission ("RFA") 105 and 107), each of which she asserts served as an "Offer of Proof" at trial. Neither exhibit nor the relevant contents thereof, however, were excluded from evidence on the basis of "federal preemption and privilege statutes"—the legal reasons raised in the point relied on. *See* Rule 84.04(e); ***Davis***, 557 S.W.3d at 352 n.10. The trial court's rationale for excluding Exhibit 224A, in its entirety, was that "whatever benefit that would give … is outweighed by the prejudicial effect of what could almost be interpreted as a re-creation of an event or a reconstruction of an event." The trial court's rationale for excluding RFA 105 in Exhibit 386AA was that Hale had not satisfied her burden to show that evidence of prior train-motor vehicle collisions at the South Iron Mountain Road Crossing "sufficiently resembled" the March 23, 2008, collision to be admissible. And the trial court's rationale for excluding RFA 107 in Exhibit 386AA was that evidence that train-activated crossing gates or arms were installed after the March 23, 2008, collision was inadmissible because it was "evidence of subsequent remedial measures."

In sum, there is no supporting argument raised by Hale that presents us with any cognizable basis for reviewing the claims that are raised in this deficient point relied on. Accordingly, Hale's second point is denied.

### Point Three

For her third point, Hale contends:

The trial court erred in excluding evidence because of federal preemption and the "mere location" rule in that said evidence that BNSF's train crew admittedly operated the BNSF train at 47 mph at the time of the collision in violation of the maximum 45-mph permitted for that train and the 40-mph permitted for the track occupied by the train, and that the collision would have been avoided if the BNSF train crew had complied with either speed limit/restriction even one minute prior to the collision, was neither preempted nor barred.

### *Briefing Deficiencies*

As with her second point, Hale fails to identify in her point relied on or in a preservation statement in her argument the particular evidence that the trial court excluded and whether and in what manner her claim of error was preserved for appellate review. *See* Rule 84.04(d)(1)(A); Rule 84.04(e). Her point is also multifarious in that it combines at least two *different* rulings or actions—the exclusion of evidence based on federal preemption *and* the exclusion of evidence based on the abolishment of the mere location rule. *See* **Buchheit, Inc.**, 391 S.W.3d at 889 n.1. Compounding this problem, the argument section reveals that Hale is again challenging the exclusion of *several* different and distinct items of evidence. *See* **id.**

Furthermore, in the argument section, Hale adds to or modifies the challenges raised in the point relied on in several respects. Hale argues that the trial court erred by violating the law of negligence and negligence per se, *sua sponte* raising the abolishment of the mere location rule, ignoring that BNSF opened the door to the evidence, and prohibiting the discussion of speed-related topics during voir dire and the parties' opening and closing statements. All of these rulings and legal arguments are outside the scope of the already overbroad and multifarious point relied on. *See* Rule 84.04(e); **Davis**, 557 S.W.3d at 352 n.10.

Turning to the evidence that Hale specifically identifies and that appears to correspond with the claims she raised in the point relied on, we discern the following *separate* evidentiary claims:

18

1. In response to Hale's Rule 59.01 Requests for Admissions which the trial court erroneously excluded from consideration by the jury,[] BNSF admitted that its train was not authorized to operate at the Class 4 maximum speed of 60 mph, that the maximum authorized speed for a Class 3 track is 40-mph, that Class 4 track that fails to meet federal requirements is reclassified to Class 3 track, that its Engineer and Conductor were required to know, communicate to one another and not exceed the maximum authorized speed, that the train was carrying hazardous materials that could form explosive hydrogen gas, and that Crossing #667633J was designated as a crossing over which hazardous materials were transported.  [Followed by a footnote to "Plaintiff's Offer of Proof Trial Exhibits Nos. 386 AA and 386 DD, Request for Admission Nos. 13, 17, 20, 23, 27, 28, 29, 30, 54, 55 and 95."]

2. In testimony that the trial court erroneously excluded from the jury's consideration, BNSF's Signal Supervisor Scott Boehme (video), Signal Call Desk Eric Bills (video), Road Foreman of Engines Doug Gibson (live), and its Division Engineer Dennis Mendoza (live), testified that the BNSF train was carrying hazardous materials over a "Key Route" on March 23, 2008 and thus the train was limited to operating at a maximum speed of 45-mph.

3. The trial court erred by excluding the testimony of Hale's train operations expert, Jimmy Scott, of BNSF's train crew's negligence in operating that train at 47 mph in violation of that 45-mph speed restriction.

4. The trial court further erred in excluding Offer of Proof Exhibit 385, BNSF's response to Hale's Request for Production of BNSF's Continuous Welded Rail Plan, in which BNSF admits that its "continuous welded rail policies and procedures were set forth in EI Chapter 6 previously produced, Bates Nos. 006725-007928.

5. And, the trial court consistently excluded the testimony and Offer of Proof Exhibit 271D regarding the 45-mph speed reduction as preempted.

None of the aforementioned claims contain citations to the transcript, and, therefore, contain no indication where in the record an attempt was made to offer the exhibits or testimony in question into evidence.  *See **Hancock***, 100 S.W.3d at 802.  Moreover, we can discern that some of the cited evidence, such as Exhibits 385 and 271D, were never offered into evidence as is required to preserve their exclusion for appellate review.  *See **id.***

Nevertheless, we are able to determine that the trial court initially, in an interlocutory ruling, excluded certain evidence that related to the alleged 40-mph and 45-mph speed limits, which, as argued by Hale, applied to the train on the track involved in the collision. The trial court's ground for this initial interlocutory exclusion appears to have been the abolishment of the mere location rule.[5]

Hale ignores in her argument, however, that the trial court revisited and changed its speed ruling at trial, stating:

> Well, Ms. Whipple, earlier in the trial before the plaintiff had made a showing as to proximate cause between any alleged speed limit violation and the collision, before you made that -- that link for causation, I had excluded evidence of a speed violation. I am no longer excluding evidence of the speed violation.

Following some discussion concerning 49 C.F.R. §§ 213.9, 213.118, and 213.119, the trial court announced: "All right. Okay. I'm going to allow evidence as to the 40-mile-per-hour speed limit. I haven't heard enough argument that I'm convinced as to the admissibility of the 45-mile-per-hour speed limit. And so, for now, that's not admitted."

Thereafter, Hale introduced expert testimony that, under 49 C.F.R. § 213.9, pertaining to a track owner's continuous welded rail ("CWR") and its CWR plan, the train was operating on a class 3 track and, therefore, was subject to a 40-mph speed limit. Moreover, during oral argument, Hale was unable to identify any evidence related to her 40-mph speed limit claim that was excluded by the trial court after the trial court advised that such evidence would be allowed.

For reasons discussed in greater detail below, evidence of the alleged 45-mph speed limit remained excluded—including testimony, which Hale introduced as offers of proof, from Doug

---

[5] "The mere location rule would permit finding causation from evidence that the train's speed at a 'remote' point in time 'caused' the train to be at the scene of the accident." ***Bartlett By and Through Barlett v. Kansas City Southern Ry. Co.***, 854 S.W.2d 396, 400 (Mo. banc 1993). "While speed at a remote point in time may be a 'philosophical' cause of a collision, it cannot be a 'legal' cause. ***Id.*** "The mere location rule cannot be the basis for submitting a claim of violating the speed limit in this, or any future, case." ***Id.***

Gibson, Dennis Mendoza, and Jimmy Scott. Because each of these evidentiary exclusions were for the same reason, we exercise our discretion to review them *ex gratia*.

<u>*The Alleged 45-mph Speed Limit Claim is Preempted by Federal Law*</u>

Gibson and Mendoza were both BNSF employees, a foreman and track inspector, respectively. Gibson testified that a BNSF "key route" is a stretch of track over which hazardous materials are shipped, that the BNSF train that collided with Hale was carrying the hazardous materials potassium hydroxide and residue of sodium hydroxide, and that explosive hydrogen gas can form if water or moisture touches those hazardous materials. Mendoza testified that the stretch of track that includes the South Iron Mountain Road Crossing was designated as a key route and that the maximum operating speed for a freight train carrying hazardous materials was 45-mph. Then during the testimony of Scott, an expert witness retained by Hale, it was established by the agreement of all parties that, to the extent the 45-mph speed limit existed, it was not mandated by federal law but was, instead, an internal policy of BNSF.

Citing **CSX Transp. v. Easterwood**, 507 U.S. 658 (1993), counsel for BNSF argued to the trial court, apparently successfully, that evidence of the 45-mph speed limit was preempted by federal law.

The courts of this state have recognized the holding of **Easterwood** that "federal law preempts state common law claims based on excessive speed." **Barlett v. Kansas City Southern Ry. Co.**, 854 S.W.2d 396, 399 (Mo. banc 1993). "*Easterwood* abolished all commonlaw claims of negligent, excessive speed." **Mott v. Missouri Pacific R. Co.**, 926 S.W.2d 81, 84 (Mo.App. 1996). As relevant here, "[e]vidence of violating a *self-imposed* timetable 'merely goes to the state common-law of negligence.'" **Id.** (quoting **Bowman v. Norfolk Southern Ry. Co.**, 832 F.Supp. 1014, 1017 (D.S.C.1993) (emphasis added).

21

In attempting to demonstrate that the 45-mph speed limit was something more than a BNSF internal policy and that it has the force and effect of federal law, Hale, as she did during the proceedings in the trial court, points to the federal regulations as contained in 49 C.F.R. §§ 213.118 and 213.119. These regulations pertain to track owners' CWR and their CWR plans and may thereby make the violation of a track owner's CWR internal rules a violation of federal law. Hale, however, failed to direct the trial court and has failed to direct this Court to any legal or evidentiary support that these regulations apply to or govern in any respect the transport of hazardous materials. In the absence of such support, neither the trial court nor this Court could find that these CWR regulations have any application to BNSF's internal rules concerning the transport of hazardous materials.

Accordingly, Hale has failed to demonstrate that the trial court abused its discretion in excluding any evidence related to BNSF's alleged internal rule setting a 45-mph speed limit for trains carrying hazardous materials. Hale's third point is denied.

### Point Four

For her fourth point, Hale contends:

The trial court erred in denying Hale's Jury Instruction No. E1.01 and No. 10 because No. E1.01 is required by the Law of this Case and No. 10 is required by federal law in that the trial court was ordered by this Court to provide Hale a new trial on all issues and the Early Case Summary of E1.01 would have prevented the jury from denying Hale a new trial on all issues and instead blaming her for the 12 year delay in justice here, and the jury should have been instructed in compliance with federal law which required BNSF to provide Hale with a timely horn warning, not just a horn warning.

### Briefing Deficiencies

Although point four makes specific references to trial court rulings or actions, it is facially multifarious because it claims that the trial court erred in two unrelated respects—failing to submit one jury instruction for a particular legal reason and submitting a different and distinct

22

jury instruction for a different and unrelated legal reason. *See **Buchheit, Inc.**,* 391 S.W.3d at 889 n.1. Furthermore, the argument portion of Hale's brief raises at least *two additional claims*— "[t]he trial court also erred in its handling of the subject of Ms. Hale's 911 call" and "[t]he trial court also erroneously failed to give Missouri Approved Jury Instructions Nos. 11.01, 13.05, 16.08 and 22.02 . . . ." These claims are unrelated to and outside the scope of the jury instruction claims raised in the point relied on. *See* Rule 84.04(e); ***Davis***, 557 S.W.3d at 352 n.10.

Hale's argument also omits a preservation statement. *See* Rule 84.04(e). In her argument addressing Missouri Approved Instructions ("MAI") E1.01 (an "early case summary"), Hale notes that, on February 4, 2020, her counsel offered an early case summary instruction that was rejected by the trial court. This offer, however, was insufficient for preservation purposes because the February 4 trial resulted in a mistrial. *See **Harden**,* 750 S.W.2d at 668 n.1. This instant appeal is from the judgment following the August 24 trial. Yet, Hale does not identify when, if ever, she made a request to submit an early case summary during that trial. *See* Rule 84.04(e).

With appropriate supporting citations to the record of the instruction conference of the August 24 trial, however, Hale argues that she sought to include "timely" in Jury Instruction No. 10 and that the trial court erroneously denied that request. We, therefore, review *ex gratia* her claim of error with regard to this instruction.

### *Adding "timely" to Jury Instruction No. 10 was not Supported by Evidence*

Jury Instruction No. 10, as given to the jury and in which the court's copy expressly stated *was submitted by Hale*, provided as follows:

> In your verdict, you must assess a percentage of fault to defendant BNSF if you
> believe:
> First, either:
> defendant BNSF's train crew failed to keep a careful lookout, or
> defendant BNSF's train crew failed to sound the horn, or

defendant BNSF failed to warn by timely activation of lights and bells, and

Second, BNSF, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, as a direct result of such negligence, plaintiff Amber Hale sustained damage.

Hale argues that this instruction should have stated that "defendant BNSF's train crew failed to *timely* sound the horn" and that this alteration "was grounded in the trial testimony of BNSF's train operations expert, Mark Pollan." Hale characterizes that testimony as follows:

Pollan testified that both the federal regulation and the BNSF rule promulgated pursuant to that federal regulation contain two requirements for the lawful sounding of a train horn/whistle: (1) the pattern in which the horn/whistle is sounded must be two longs, one short, and one long, and that pattern must be repeated *until the train fully occupies the crossing*; and (2) the sounding of the horn/whistle must commence at the whistle board, ¼ mile from the crossing, 15-20 seconds from the crossing, *and that Wait and Frost failed to sound the horn in the required pattern and time period*.

(Emphasis added.)

Hale's argument fails for two reasons. First, Hale mischaracterizes Pollan's testimony. Pollan testified regarding the March 23, 2008, collision that Wait began the horn sequence 15-20 seconds from the South Iron Mountain Road Crossing *as required*. However, the collision occurred *before the train fully occupied the crossing*. When the collision occurred, Wait ceased sounding the horn and applied the emergency brake. As made clear by Pollan in his testimony:

Q. But if you're saying that the proper pattern began here with two longs, a short, and this was the beginning of the final required long, he didn't start it soon enough, did he? Because we already know, he was already in the crossing because he had already had a collision with Ms. Hale.

A. But it's through the other side of the crossing, until crossing is completely occupied. If you wouldn't have had the collision*, then you would have had four to five seconds of horn on that last one until he reached the other side of the road crossing*. So the rule does say until crossing occupied.

(Emphasis added.)

24

Second, Hale specifically testified that as she approached the South Iron Mountain Road Crossing she did not hear either a train horn or warning bells. The trial court referenced this testimony during the instruction conference when it denied Hale's request to add the word "timely" to Jury Instruction No. 10.

The evidence adduced at trial, therefore, supported a finding that either (1) the train horn was sounded in accordance with the applicable timing rule or (2) no train horn was sounded. A claim that the horn was sounded, but was done so untimely, was not supported by the evidence. Thus, the trial court did not err in submitting Jury Instruction No. 10 as written. *See **Oldaker v. Peters***, 817 S.W.2d 245, 251 (Mo. banc 1991) ("An issue submitted by an instruction must be supported by the evidence; the submission of any proposition without sufficient evidentiary foundation is error."). Accordingly, Hale's fourth point is denied.

### *Point Five*

For her fifth point, Hale contends:

> The trial court erred in excluding because it found as a "subsequent remedial measure" all evidence of the 2007 crossing signal warning system in that Missouri had approved and funded the system at least 9 months prior to the March 23, 2008 collision and BNSF had delayed installing the system until after the collision.

#### *Briefing Deficiencies*

Like her second and third points, Hale fails to identify in this point relied on or in a preservation statement the particular evidence that the trial court excluded and whether and in what manner her claim was preserved for appellate review. *See* Rule 84.04(d)(1)(A); Rule 84.04(e). Furthermore, in her argument, Hale again makes several—at least three—*different* claims. *See **Buchheit, Inc.***, 391 S.W.3d at 889 n.1. Those claims are as follows:

1. Here, the trial court erroneously excluded all of Hale's evidence that BNSF had known, at least by July 2007 if not much earlier, of problems with the warning system at Crossing #667633J and had thus obtained MoDOT's approval, Missouri taxpayer money and even the engineering

25

drawings needed to replace that crossing warning system with an entirely new and upgraded system. [Followed by a footnote containing a citation to "Section II herein."]

2. And, it was error for the trial court to exclude the post-March 23, 2008 actions of the State of Missouri and of Webster County, both of which were encompassed within the evidence excluded wholesale by the trial court. (Exhibits 119, 120A and 120B).

3. Erroneously citing the grounds of "subsequent remedial measures," the trial court also excluded the video and photographic evidence from Hale's expert accident reconstructionist, Michelle Beach, that would have provided the jury a fair and accurate representation of the many obstructions to Hale's ability to see the oncoming train as she approached the South Iron Mountain Road Crossing. (T 1862-1875).

The first two of these claims are fatally flawed. The first claim does not cite to any specific item of evidence that supports it but, rather, is followed by a footnote that broadly cites to the entirety of "Section II" (containing Hale's second point relied on and supporting argument). *See Frazier*, 467 S.W.3d at 346. Likewise, the second claim presents nothing to review because, as explained in our discussion of Hale's second point, *supra*, it cites to and is based upon exhibits that were never offered into evidence at trial. *See Hancock*, 100 S.W.3d at 802.

The third claim, in contrast to the other two, identifies specific items of evidence—video and photographs created by Michelle Beach, an accident reconstructionist who provided expert testimony for Hale. The claim is followed by a transcript citation that corresponds to the trial court's exclusion of a "Demonstrative Video" (Exhibit 269), a "Photo South of Crossing" (Exhibit 269H), and a "Comparison Photo" (Exhibit 271) on the basis that these items, which were taken in 2018, depict the gate and light improvements made to the South Iron Mountain Road Crossing after the March 23, 2008, collision. Because Hale's briefing violations do not substantially impede our ability to review this claim, we do so *ex gratia*.

26

Generally, in negligence actions, a trial court should exclude evidence of subsequent remedial measures. Evidence of subsequent remedial measures to show negligence is prohibited for two reasons. First, no one would make improvements after an accident if the precautions taken could be used as evidence that previous conditions were not reasonably safe. Second, changes after an accident are irrelevant to establish the condition that existed at the time of the accident. Because public policy favors remedial measures, evidence that a defendant took precautions after an accident to prevent a reoccurrence of the accident, or made changes or repairs to the property or place causing the accident, is not competent evidence to be used against the defendant to show previous negligence or an admission of negligence.

**Watson v. City of St. Peters**, 599 S.W.3d 479, 485 (Mo.App. 2020) (internal citations omitted).

Here, our discussion begins and ends with a determination that no prejudice resulted from the exclusion of Exhibits 269, 269H, and 271 from admission in evidence. In her brief, Hale argues that these exhibits would have shown the jury that, at the South Iron Mountain Road Crossing, "a motorist's ability to physically 'see' any oncoming train was obstructed by buildings, trees and bushes until the motorist was only 1.6 – 2 seconds from the crossing." This argument is premised, however, upon the following *testimony* of Beach, given without the jury present, during an offer of proof:

> Q. Were you able to calculate how many seconds away from the nearest rail of the track was Ms. Hale when she could have taken her eyes off the road ahead, looked to her right, and seen the oncoming train?

> A. If we're talking about a totally unobstructed line of sight, that was about 130 to 150 feet, which would be approximately, depending on what speed you look at in that range of speeds, would be an associated time of about 1.6 to about two seconds.

But Beach was allowed to and did provide similar testimony, when testifying to the jury, in which the following exchange occurred:

> Q. Okay. And, again, from Ms. Hale's perspective, as the driver heading north toward the track, after she passed that 300-foot mark, say she got to the 290-foot mark, did she continue to have this same opportunity to take her eyes off the road, look to the right, and see the train?

27

A. There wouldn't have been a similar opportunity because the closer that she gets to the crossing, there's actually additional trees and things around that area. She actually has to continue to move forward somewhere around 130 to 150 feet away before there would be a totally unobstructed view of the crossing. There wouldn't be any type of trees or shrubs or buildings that would affect her line of sight. And, of course, it wouldn't affect the train crew's line of sight as well.

Moreover, Hale was not without exhibits that could have been used to provide the jury with visual context vis-à-vis Beach's testimony. Exhibits 5-9, photographs depicting the South Iron Mountain Road Crossing in 2008, were offered by Hale and admitted into evidence. Beach was asked, during the aforementioned offer of proof, to compare these photographs with the photographs that she took in 2018. Beach confirmed that both sets of photographs had comparable vantage points, displayed the same perspectives, were taken during the daytime, the same buildings and trees were present, and there were no changes to the topography.

The absence of Exhibits 269, 269H, and 271 did not deprive the jury of hearing Beach's testimony as to her investigation and findings nor did it deprive them of visual aides to help contextualize those findings and, therefore, their exclusion from evidence was not outcome-determinative. Hale, therefore, suffered no prejudice from their exclusion. *See **Bowolak***, 452 S.W.3d at 703. Accordingly, we need not and do not address their admissibility. Hale's fifth point is denied.

### *Point Six*

For her sixth point, Hale contends:

The trial court erred in excluding evidence because it was evidence of "previous incidents" in that Hale's evidence was admissible as proof that BNSF had notice that its engineer had operated BNSF trains on even the same stretch of track and collided with ten others prior to the March 23, 2008 collision with Hale, in comparison to other engineers of similar seniority with only zero to two such incidents, particularly after the trial court admitted BNSF's evidence that its engineer was a "perfectionist" who obeyed safety rules and speed restrictions and so was tasked with training BNSF's other engineers.

28

As with her second, third, and fifth points *supra*, Hale fails to identify in her point relied on or in a preservation statement the particular evidence that the trial court excluded and whether and in what manner her claim was preserved for appellate review. *See* Rule 84.04(d)(1)(A); Rule 84.04(e). Furthermore, in her argument, Hale again makes *several*—at least four—different claims. *See Buchheit, Inc.,* 391 S.W.3d at 889 n.1. Those claims are as follows:

1. Disregarding this governing Missouri law, the trial court erroneously excluded Wait's sworn testimony regarding his ten previous similar incidents of collisions between the BNSF train he was operating and motorists or pedestrians, many of which collisions occurred on the same stretch of track that includes the South Iron Mountain Road Crossing. (Aug. 20, 2020 Hearing p. 3-13, T 324-325, 565-575).

2. The trial court erroneously excluded the sworn testimony of Wait's direct supervisor, Doug Gibson, that he had no knowledge of, and was not even concerned by, Wait's 10 previous similar incidents, even though Gibson had only 2 such incidents in his 19-year career operating BNSF trains.

3. And, the trial court erred by excluding the sworn testimony of Hale's train operations expert Jimmy Scott that, in his 26-year career as a railroad engineer, he had only 2 incidents with a motor vehicle, he had supervised 1200-1500 engineers in the course of his career, he knew of many engineers with even 40 year careers who had zero incidents with motor vehicles, and that he would have "restricted" an engineer with Wait's history if he had been Wait's supervisor.

4. The trial court further erroneously excluded BNSF's responses to Hale's Rule 59.01 Requests for Admissions Nos. 100, 101 and 102, in which BNSF admitted to 3 collisions with motor vehicles that occurred while Wait was operating BNSF's trains. (Exhibit 386AA).

All of the listed claims and evidence, however, pertain to a single issue—Wait's prior collisions. Additionally, while only the first and fourth claims contain any citations to the record, thereby directing us to some, but not all, of the places in the record where the evidence listed was offered, ruled upon, and a showing of proof made, *see* Rule 84.04(e); *Hancock*, 100 S.W.3d at 802, the remaining necessary citations, that show that Hale's claims were preserved at

the trial court level, are readily ascertainable. Hale also directs us to the portions of the transcript where she asked the trial court to reconsider its rulings excluding this evidence on the basis that BNSF had opened the door to inquiry of Wait's safety record. For these reasons, we review Hale's claims *ex gratia*.

*No Abuse of Discretion in the Exclusion of Evidence of Prior Incidents*

Hale's argument is two-fold. First, Hale argues that evidence of prior incidents involving Wait were admissible under Missouri caselaw generally standing for the legal principle that "[a] trial court may admit evidence of prior accidents if the evidence is of an accident *of like character that occurred under substantially the same circumstances and resulted from the same cause*." **Lopez v. Three Rivers Elec. Co-op.**, Inc., 26 S.W.3d 151, 159 (Mo. banc 2000) (emphasis added). Second, Hale cites to evidence elicited by BNSF regarding Wait's safety training and reputation and argues that evidence of prior incidents involving Wait was admissible because "[a] party who raises a subject waives the right to challenge further evidentiary development of that subject." **Burrows v. Union Pacific R. Co.**, 218 S.W.3d 527, 537 (Mo.App. 2007).

Both arguments fail for the same reason—Hale's offers of proof at trial did not make the requisite showings necessary to admit the proffered evidence. Specifically, while Hale made offers of proof as to ten incidents that involved trains operated by Wait, those offers of proof only specified the years and locations of those incidents and whether those incidents involved collisions with vehicles, collisions with pedestrians, or injury to railroad conductors onboard. Hale's offers of proof did not demonstrate, however, either that those previous incidents were of *like character* as the March 23, 2008, collision or that they happened as a result of any *unsafe* operation of a train by Wait. Without this foundational information, the proffered evidence was

30

not admissible.  Having failed to demonstrate any trial court abuse of discretion in excluding this evidence, Hale's sixth point is denied.

### Point Seven

For her seventh point, Hale contends:

> The trial court erred in admitting BNSF's evidence that Hale had received Medicaid benefits and currently has health insurance because of the 'dire financial condition' exception to the Collateral Source Rule's bar of such evidence in that Hale did not testify to dire financial condition.

### Briefing Deficiencies

"The collateral source rule prevents a tortfeasor from reducing his liability to an injured person by proving that payments were made to the person from a collateral source." *Smith v. Shaw*, 159 S.W.3d 830, 832 (Mo. banc 2005).

In her argument Hale omits any preservation statement.  Hale identifies, by citation to the record, a bench conference during which the parties argued to the trial court about whether evidence, in general, of Hale's Medicaid and health insurance benefits help in paying her medical bills was admissible and the trial court made an interlocutory ruling indicating that Hale had opened the door to their admission.  Such an interlocutory ruling, preserves nothing for appeal.  *See Hancock*, 100 S.W.3d at 802.  Hale fails to identify whether any evidence of her Medicaid or health insurance benefits was later ultimately admitted into evidence and whether such evidence was admitted over her counsel's renewed, contemporaneous objection.  *See* Rule 84.04(e); *Matter of Estate of Dean*, 967 S.W.2d at 222.  Hale, therefore, fails to show that she preserved her erroneous admission of evidence claim for appellate review.  *See Marck Industries, Inc.*, 587 S.W.3d at 745.  *Ex gratia*, we have verified from the record that, upon BNSF's offer into evidence of Exhibit 771, containing proof of Hale's current health insurance coverage, Hale's counsel stated, "we'll just stand on our prior objections and go with the Court's

31

ruling[,]" and the trial court admitted the exhibit into evidence.  We will, *ex gratia*, review Hale's claim in her point relied on as to the trial court's admission of Exhibit 771.

<u>Hale Not Prejudiced by Admission of Exhibit 771</u>

BNSF argues that Hale cannot show that she was prejudiced by the admission of this exhibit.  BNSF is correct.  Here, Jury instruction No. 8, which was submitted by Hale, directed the jury to determine Hale's damages only "[i]f you assess a percentage of fault to defendant." Thus, there can be no prejudice from admission of Hale's current health insurance status on the basis of an alleged violation of the collateral source rule because the jury, in finding no fault on the part of BSNF, never reached the issue of damages.  Accordingly, Hale's seventh point is denied.

### Point Eight

For her eighth point, Hale contends:

> The trial court erred in denying Hale the adverse inference because Missouri law mandates that sanction in that BNSF admitted its spoliation of evidence of malfunction of the crossing signal warning system and of speed limits/restrictions and Hale was greatly prejudiced because the jury instead adversely inferred that Hale had failed to diligently attempt to meet her burden of proof.

<u>Briefing Deficiencies</u>

As the argument in support of this point makes clear, point eight is multifarious in that it is based on the denial of *two* separate motions, filed on July 19, 2019, and January 8, 2020, that sought sanctions, which included adverse inferences, for the alleged spoliation of *ten* categories of evidence having to do with *two* separate trial issues (specifically, three items relevant to the malfunction of the crossing warning system and seven items relevant to speed restrictions).  *See* ***Buchheit, Inc.***, 391 S.W.3d at 889 n.1.  However, we review this point *ex gratia* because Hale's citations to the record reveal a singular reason why the multitude of claims in this point are universally deficient.

32

"Spoliation is the intentional act of destruction or significant alteration of evidence." ***Hill v. SSM Health Care St. Louis***, 563 S.W.3d 757, 761 (Mo.App. 2018). "Spoilators are subject to an adverse evidentiary inference where they are held to admit that the destroyed evidence would have been unfavorable to their position." ***Tribus, LLC v. Greater Metro, Inc.***, 589 S.W.3d 679, 693 (Mo.App. 2019) (internal quotation marks omitted). "A determination that a party has committed spoliation must be supported by a finding or adverse inference of intent, and the party asserting spoliation has the burden to prove the opponent destroyed, altered, concealed, or suppressed the evidence at issue under circumstances manifesting fraud, deceit, or bad faith." ***Ball v. Allied Physicians Group, L.L.C.***, 548 S.W.3d 373, 386 (Mo.App. 2018).

"A motion does not prove itself and the burden is on the movant to prove its allegations." ***Taylor v. Coe***, 675 S.W.2d 148, 150 (Mo.App. 1984). "Production of proof supporting motions in civil cases is governed by Rule 55.28." ***Mack v. Mack***, 349 S.W.3d 475, 477 (Mo.App. 2011). That rule provides that "[w]hen a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions." Rule 55.28. Under this rule, "[e]xhibits attached to motions filed with the trial court are not evidence and are not self-proving." ***Ryan v. Raytown Dodge Co.***, 296 S.W.3d 471, 473 (Mo.App. 2009) (internal quotation marks omitted). "Similarly, an appellate court cannot accept counsels' statements as a substitute for record proof even if there is no reason to doubt their accuracy." ***Id.*** "Thus, where a party does not verify its motion or support it with affidavits or testimony, a trial court does not err in denying the motion." ***Mack***, 349 S.W.3d at 477.

Here, Hale exclusively cites and relies upon her two motions and the exhibits attached thereto as support for her claims that the trial court abused its discretion in failing to award her

33

adverse inferences based upon the spoliation of evidence. Neither of those motions, however, were verified. And while many of the exhibits attached to the motions are purported to be verified requests for production and interrogatory responses from BNSF, the fact remains that Hale—the proponent of the motions—failed to make any attestation under oath as to the authenticity of these or any other exhibits. Moreover, if any evidentiary hearings were held on these motions, Hale has failed to identify where in the voluminous record the facts necessary to support her claims of spoliation may be found, much less how that evidence properly viewed under our standard of review demonstrates an abuse of discretion by the trial court.

Because the record on appeal provided by Hale shows no evidentiary basis under Rule 55.28 upon which the trial court could have sustained her motions for sanctions against BNSF, we cannot say the trial court abused its discretion in denying them. Accordingly, Hale's eighth point is denied.

### Point Nine

For her ninth point, Hale contends:

The trial court erred in denying Hale's requested discovery and sanctions because governing law mandated that discovery and sanctions in that the sworn testimony of BNSF's employees proved that BNSF misrepresented to the trial court that its employees' training was web-based and thus never preserved and that documents withheld from Hale's discovery were privileged.

#### Briefing Deficiencies

Hale's ninth point claims error with regard to *two* separate and distinct classes of evidence, each of which, individually, could give rise to reversal of the judgment. According to Hale, certain requested discovery and sanctions were denied because BNSF misrepresented to the trial court (1) "that its employees' training was web-based and thus never preserved" and (2) "that documents withheld from Hale's discovery were privileged." Point nine, therefore, is multifarious. *See Buchheit, Inc.*, 391 S.W.3d at 889 n.1. The argument reveals, however, that

34

each of these claims were separately briefed, argued, and preserved in the trial court. Therefore, in its discretion, this Court elects to review *ex gratia* only the first of the two claims in Hale's multifarious ninth point. *See* **Griffitts**, 550 S.W.3d at 478.

*Hale Fails to Demonstrate that the Challenged Trial Court Ruling was Based Upon Any Alleged Misrepresentation by BNSF*

Hale's first claim challenges the trial court's denial of her "good cause" motion, filed on April 28, 2020, "for leave to obtain discovery of rules/safety materials (or sanctions)" from BNSF. That motion rested upon two premises.

Hale's first premise was that BNSF, at a hearing on October 25, 2019, "misrepresented" to the trial court "that its 11 current and former employees involved in the collision and post-collision investigation had received rules and safety training that was web-based or computer-based, and thus the materials are not available to produce[] in response to Hale's Notices of Video Deposition *Duces Tecum*." In support, Hale pointed to deposition testimony of the current and former employees in question, taken after the October 25, 2019, hearing, that the majority of their training was in classrooms with instructors, not web-based or computer-based.

Hale's second premise was that the trial court "relied on BNSF counsel's misrepresentations to subsequently enter three (3) Orders which erroneously blocked Hale's right to discovery of these relevant materials, and shielded BNSF from that evidence which is likely to support Hale's claims[.]" The three orders, allegedly based upon a misrepresentation, were entered on October 25, 2019, November 1, 2019, and November 18, 2019. The first two of those orders refer to an October 25, 2019, hearing at which argument was heard on objections, that were filed by BNSF on October 23, 2019, to Hale's deposition notices *duces tecum*. The first order stated that BNSF's objections were sustained in part as to Steve Wait and Lance Frost. The second order stated that BNSF's objections were sustained in part as to Eric Bills, Eric Ege,

35

Douglas Gibson, William Henderson, William Kelley, Dennis Mendoza, Barry Wunker, Scott Boehme, and Kevin Barden. Attached to each order were employee transcripts listing training courses, some of which the trial court had bracketed and ordered BNSF to produce. The third order was an amendment to the second order, attaching additional pages of Scott Boehme's transcript with additional material identified and ordered for production.

In her argument, Hale does not cite to, and this Court cannot locate in the record on appeal, BNSF's objections filed on October 23, 2019. The record contains, however, the transcript from the hearing on October 25, 2019.

Our review of that transcript reveals the following. After noting that BNSF "filed objections this week to notice of duces tecum for upcoming depositions[,]" the trial court allowed argument. Hale's counsel spoke first and described BNSF's objections as follows:

> [by Hale's counsel:] And, therefore, BNSF now objecting that that language is *overly broad*, *not relevant*, *not proportional*, *burdensome and harassing*, appears to Hale to be directed to the Court's order, not Hale's duces tecum language, because Hale quoted the Court's order.
>
> And so we're in a weird situation here where Hale had her own duces tecum requests that the Court restructured through its October 7th order. The Court, in doing that, of course, made the scope of the discovery that Hale was seeking narrower than what Hale had hoped for. Hale obeyed that.
>
> BNSF would now *like to make it even more narrow*. And to me that is not seeming like we are offering due process or fair discovery here.
>
> If the Court wants me to address substantively -- again BNSF is making *a temporal limits argument* and they're making *a relevance argument*. And I can address both of those today.

(Emphasis added.) Following additional argument, the trial court interjected:

> THE COURT: Well, the intention at the previous hearing was that, at least in my mind, *the request was, in fact, overbroad*. And then there was a discussion about the fact that there is --
>
> What are they called, an employee transcript with respect to each employee that gets their training?

36

[BNSF's COUNSEL]:  Yes.

THE COURT:  So I thought the tenor of the conversation was, well, let's figure out what you really want, rather than giving these very broad languages -- language that asks for almost everything in the world.  *Let's narrow it down to what you're really wanting.*

So it doesn't come as a surprise to me that there might be an argument now that we know specifically what the plaintiff is wanting that the defense might have an objection to that.  So -- as to the way this has played out procedurally, it's playing out about the way that I expected it to, which is you've now made your specific requests.  *Now we're going to determine whether or not you're entitled to all the documents you requested.*

(Emphasis added.)  BNSF's counsel then offered argument, which, in pertinent part, consisted of

the following:

[by BNSF's counsel:]  As I indicated to the Court and to opposing counsel off the record before we started this morning, BNSF has undertaken an exhaustive effort to try to identify, based on the highlighted transcripts that were highlighted by plaintiff's counsel to determine what still exists.  The majority of these training courses that these individuals had --

Barry Wunker, I would just point out as we had previously advised opposing counsel, he wasn't even involved at the time of this accident, had nothing to do with this accident. He is still a BNSF employee.  But, you know, we understand that the Court has allowed his deposition.

But setting his aside, as to the other individuals, the majority of the training that they received was either what's called CBT, computer-based training, or WBT, web-based training. And the determination has been made that the majority of the training that is identified in the highlights from the transcripts, either fell within one of those two categories --

THE COURT:  What was the first category?

[BNSF's COUNSEL]:  CBT, computer-based training.  And that those are no longer maintained.

There are some exceptions to those two categories, the CBT and WBT, and that has to do with some printed documents.  One in particular which has been identified which would have been applicable to Mr. Frost. It has to do with training for conductors in 2005.

And so consistent with what we understand the overall parameters of the Court's order to be, and in relationship to this particular case, we will certainly provide that. They are currently working on trying to identify any other

37

documents that fall outside of the CBT and the WBT that are within the training and that are relevant to those categories.

But, you know, how substance abuse training in any way enters into this case -- there's never been any evidence that Mr. Wait or Mr. Frost were under the influence of substances, nor that any of the signal folks nor that any of the others who worked for BNSF at the time, not only who were deposed or testified at trial, were under the influence of any substances. Same thing with all these other categories of leadership training and whatnot.

And BNSF is cognizant of the fact that the first set of depositions are to occur on October 31st. As we have said, they have identified one of these that was outside of the CBT and the WBT. We will provide that because we believe it falls within the category of what the Court indicated the parameters would be. And we will provide the others that fall within the parameters applicable to this case for those employees with regard to their position and their duties at the time.

At the time beyond that, your Honor, *we do believe that it's burdensome. It's not proportional. It's not temporal.* As you have seen from the transcripts, there are things going back all the way to 1990.

(Emphasis added.) Ultimately, the trial court provided a road map as to how it planned on issuing its rulings on BNSF's objections:

THE COURT: What I have in mind is to go through the subpoena duces tecum and attach those as an exhibit to the order and circle the items *that I believe should be provided. And I realize some of those might not exist*. But that way we'll at least know which is lawfully covered by the subpoena.

(Emphasis added.)

In the above context, it appears that the trial court based its three orders, dated October 25, 2019, November 1, 2019, and November 18, 2019, on the objections raised and filed by BNSF on October 23, 2019. During the October 25, 2019, hearing, BNSF's counsel briefly mentioned that some prior web-based and computer-based training may be irretrievable. However, the greater context of the hearing suggests that BNSF's objections concerned other matters; specifically, that Hale's document requests were overly broad, not relevant, not proportional, burdensome, and harassing.

In any event, Hale failed to supply this Court with BNSF's objections. Rule 81.12(a) requires that "[t]he record on appeal shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision." Such evidentiary omissions "will be taken as favorable to the trial court's ruling and unfavorable to the appellant." *In re Estate of Abbott*, 944 S.W.2d 279, 284 (Mo.App. 1997).

Hale's second premise—the trial court relied on BNSF misrepresentations to subsequently enter the three orders—is refuted by the record provided by Hale and in the context within which we must view it. Rather, the three orders appear to be the trial court's attempt to address BNSF's objections to Hale's overbroad requests. Thus, even assuming, without so finding, the existence of a misrepresentation as alleged, it was not the basis of and had no bearing on the trial court's challenged rulings. Hale has failed to demonstrate that the trial court abused its discretion in failing to order Hale's requested discovery and sanctions against BNSF. Accordingly, Hale's ninth point is denied.

### Point Ten

For her tenth point, Hale contends:

The trial court erred in application of the law governing discovery and procedure because the ends of justice required the trial court to provide Hale a fair opportunity to present the facts to the jury in that the trial court's accumulated errors also caused the withdrawal of one of Hale's experts, permitted BNSF to take a late deposition but denied that right to Hale, interfered with Hale's presentation of evidence that the trial court did permit the jury to consider, and excused BNSF's failure to timely oppose Hale's post-trial motions which the trial court then denied.

### Briefing Deficiencies

In her preceding points, which at a minimum lacked specificity, Hale at least suggested that her challenges were based upon trial court rulings or actions. The same cannot be said of

39

Hale's tenth point, which merely asserts, without even a general reference to a trial court ruling or action, that "[t]he trial court erred in application of the law governing discovery and procedure …." *See* Rule 84.04(d)(1)(A). While Hale's "accumulated errors" challenge is likely rooted in the trial court's denial of her motion for a new trial, it is still incumbent on Hale to demonstrate where in the motion and to what extent this challenge was raised below. Hale, however, fails to do this. The argument section of her brief, which omits a preservation statement, *see* Rule 84.04(e), merely describes various events that occurred during the course of the proceedings uncoupled from any trial court rulings or actions and without any explanation or analysis demonstrating trial court error. Hale, therefore, has failed to present a cognizable claim for appellate review. Accordingly, Hale's tenth point is denied.

## Decision

The trial court's judgment is affirmed.

GARY W. LYNCH, C.J. – OPINION AUTHOR

MARY W. SHEFFIELD, P.J. – CONCURS

NANCY STEFFEN RAHMEYER, Senior Judge – CONCURS